J-A21037-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CHARLES LEFEVER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| HORSEPOWER ENTERPRISES, LLC | : | No. 1824 MDA 2024 |

Appeal from the Judgment Entered March 17, 2025
In the Court of Common Pleas of Lancaster County Civil Division at
No(s): CI-20-02229

BEFORE: PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED DECEMBER 02, 2025**

Appellant, Charles Lefever (hereinafter, "Lefever") appeals from the March 17, 2025 judgment entered on the verdict in favor of Appellee, Horsepower Enterprises, Inc. (hereinafter, "Horsepower"), and against Appellant, in the action Appellant brought against Appellee for $537,204.84, which was the sum he paid Appellee to build a custom hotrod from a 1934 Ford Cabriolet body that Appellant purchased on eBay. After careful review, we affirm the judgment.

The relevant facts of this case, as gleaned from the certified record, are as follows: Lefever is a former businessman who resides in Palm City, Florida with his wife, but grew up in in Lancaster County, Pennsylvania, where he was

---

[*] Former Justice specially assigned to the Superior Court.

familiar with Horsepower Enterprises, Inc. On July 13, 2012, Lefever sent an email to Greg Sangry, the General Sales Manager at Horsepower, to inquire about building a classic hot rod from the 1937 Ford Cabriolet that he purchased on eBay. On April 26, 2013, Lefever emailed Sangry a list of things he wanted for a car, and conveyed to Horsepower that it was important to him that the car had to be a "winner." After arranging for the car's delivery to Horsepower, Lefever and his wife went to Horsepower in April 2013 to meet with Sangry and Gerek Brodfuhrer, the original project manager for the vehicle, to discuss restoring the car. Lefever testified that he was aware that the cost to build a car from scratch could be as much as $160,000.00 to $200,000.00, which did not frighten him because his desired orange paint job alone would be costly. Lefever gave Horsepower a $20,000.00 dollar check to commence the work.

There was no written contract to restore the car; the work was done on a time and materials basis, with invoices sent to Lefever initially on a monthly basis and then later on a bi-weekly basis. Horsepower would send pictures and a video link with the invoices to show the progress on the car, and Lefever communicated frequently with Horsepower by email.

At some point, Lefever became upset with the amount of time it was taking to complete the car, but indicated that he was not upset about the cost of the restoration project. In addition to picking the type of car to build, Lefever made the final choices regarding the customization of the car including

the suspension, transmission, the chrome, the orange paint color, the interior work, the wheels, hood rods, and air ride suspension. Brodfuhrer testified that when he was at Horsepower from 2013 to 2017, Lefever came in to see the car twice a year.

In May 2017, Caroline Ecklin became the General Manager at Horsepower, and in July 2017, both Brodfuhrer and Sangry left the company. At that point, the car had been at Horsepower over four years and was still not completed. Ecklin was aware that the car had been taking too long to be completed and promised Lefever she would put more team members on his car as they became available. Ecklin further testified that further delay was caused when the upholsterer, Tom Eberhardt, became ill. Lefever also made a last-minute change to the car by asking for pinstriping although Ecklin tried to convince him not to do it. Horsepower eventually found someone to do the work.

After a newspaper article came out in September 2019 regarding the car's restoration, Lefever told Ecklin to make sure the car is prepped and ready and discussed with them what shows he should take the vehicle to. The car was shown in Lexington, Kentucky; in York County, Pennsylvania where it got an Honorable Mention, and in Ocean City, Maryland, where it got 6th place. On October 14, 2019, Lefever sent an email to Horsepower congratulating them on the 6th place win, but later claimed he did so only because "You don't whip a dog when it's bad." Thereafter, on October 25, 2019, Lefever sent an

email to Horsepower saying he just got the appraisal and inspection report completed on the car and it scored a number #1 in all categories. The appraisal came in at $295,810.00.

Lefever testified that what made him finally pull the car from Horsepower was when a friend emailed him a newspaper article, in which an employee of Horsepower is quoted as saying "the car is not really meant to be driven because it doesn't handle well going much faster than 40 miles per hour. But that's okay with Lefever." At trial, the employee who was quoted in the newspaper article, Daniel King, testified that he did not tell the news reporter that the car would not feel safe driving over 40 mph. The employee explained that the car is an "art piece" and going over 35 would seem criminal if he had gotten a rock chip and the whole panels would have to be repainted. Lefever also testified that he did not take the car back from Horsepower when he initially became dissatisfied because he did not want the car to become an "orphan."

The Lefevers came to Horsepower to see the car when it was nearly completed and indicated that they were happy with it. Lefever has not had any additional work done to the car since putting it into storage nor has he tried to sell it. The car took approximately 6 years to complete, and the total amount of payments made by Lefever to Horsepower was $537,204.84.

The trial court summarized the relevant procedural history of this case as follows:

- 4 -

> On February 26, 2020, [Lefever] filed a nine-count complaint against [Horsepower]. For each count, irrespective to the correct measure of damages, Lefever demanded $537,204.84 which was the sum he paid to build a custom hotrod from a 1934 Ford Cabriolet body he bought on e[B]ay. A bench trial was held beginning on August 28, 2024 and concluding on August 30, 2024. Lefever testified by video deposition.
>
> At the conclusion of trial, the parties were directed to file proposed findings of fact and conclusions of law, which the parties did on November 4, 2024. Lefever's final conclusion was that he was entitled to $537,204.84 pursuant to each one of his claims. On November 18, 2024, the court's verdict was recorded finding against Lefever and for Horsepower on all nine counts. On November 29, 2024, Lefever filed a motion for post[-]trial relief and supporting brief which was denied by the trial court on November 3, 2024. On December 16, 2024, Lefever timely filed the notice of appeal.

Trial court opinion, 2/12/25 at 1-2 (footnotes and extraneous capitalization omitted).[1]

On appeal, Lefever raises the following issues for our review:

1. Did the[] trial court err when it ruled that [Lefever] had not proved a claim under the Unfair Trade Practices Act?

2. Did the trial court err when it ruled that [Lefever] had not proven fraud by Horsepower Enterprises?

3. Did the trial err when it ruled that [Lefever] had not proven a claim conversion[?]

---

[1] Lefever and the trial court have complied with Pa.R.A.P. 1925.

4. Did the trial court err when it found that [Lefever] had not proven a claim for breach of contract?

5. Did the trial Court err when it ruled that [Lefever] had not proven a claim for negligence and negligence *per se*?

6. Did the Trial Court err when it ruled that [Lefever] had not proven a claim under the Magnusen Moss Warranty Act?

7. Did the trial court err when it found that [Lefever] had not proven a claim for breach of warranty?

8. Did the trial court err when it ruled that [Lefever] had proven a claim for unjust enrichment?

Appellant's brief at unnumbered, § IV.

Our standard of review of a non-jury trial

is limited to determining whether the trial court's findings are supported by competent evidence and whether the trial court committed an error of law. In making this determination, we view the evidence and all inferences derived from the evidence, in the light most favorable to the victorious party. Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent an error of law or abuse of discretion.

***Voracek v. Crown Castle USA Inc.***, 907 A.2d 1105, 1107 (Pa.Super. 2006) (citations and internal quotation marks omitted), ***appeal denied***, 919 A.2d 958 (Pa. 2007). This Court has long recognized that we will respect a trial court's findings with regard to the credibility and weight of the evidence "unless the appellant can show that the court's determination was manifestly

erroneous, arbitrary and capricious or flagrantly contrary to the evidence." ***Kowalski v. TOA PA V, L.P.***, 206 A.3d 1148, 1160 (Pa.Super. 2019) (citation omitted).

On appeal, Lefever raises a litany of claims based on fraud, conversion, breach of contract, unjust enrichment, negligence and negligence ***per se***, breach of contract, breach of warranty, and violations of the Magnusen Moss Warranty Act[2] and the "catchall" provision of the Unfair Trade Practices and Consumer Fraud Law.[3]  ***See*** Appellant's brief at 20-33.

Instantly, the trial court authored a comprehensive, 32-page opinion wherein it found in favor of Horsepower and against Lefever on all nine counts of the complaint.  Specifically, the trial court found that Lefever's testimony as a whole was not credible and this appeared to the court to be a case of "buyer's remorse."   The trial court also concluded that the evidence demonstrated that Lefever was actively involved in the rebuilding and customization of the 1937 Ford Cabriolet and that he was happy with the car until it did not win a first place award after a mere three car shows.  The trial court noted that according to Lefever's own expert witnesses, the things that hurt the car's ability to win at the car shows were, ***inter alia***, the choice of color, pinstriping, large gauges, and body style chosen, but these were all

---

[2] 15 U.S.C. § 2301 ***et seq.***

[3] 73 P.S. § 201-2(4)(xxi).

things that Lefever elected, and that Horsepower built the car Lefever wanted. *See* trial court opinion, 2/12/25 at 16-32.

The trial court further noted that despite Lefever's claim that Horsepower was just waiting for him to die, it found no evidence that Lefever was being "tricked or deceived," and instead, the record shows that he was pleased with the rebuilding and customization of the car. The trial court agrees with Lefever that Horsepower took an excessively long time to complete the project, but there was no agreed-upon date for completion and Lefever – a successful and savvy businessman – should have been aware of the importance of putting things into writing. *Id.*

The trial court also found that a prior stroke Lefever had suffered did not impair him cognitively, and there was no reason given by either Lefever or his wife that they did not realize how much money was being spent on the car's build. The trial court also found that Lefever failed to give any credible reason as to why they were unable to remove the car from Horsepower sooner and take it to another customization shop. *Id.*

Following a thorough review of the record, including the briefs of the parties, the applicable law, and the well-reasoned analysis of the trial court, it is our determination that Lefever's claims on appeal warrant no relief and the trial court opinion properly disposed of all of his issues. Accordingly, we adopt the comprehensive February 12, 2025 opinion of the Honorable Jeffrey A. Conrad as our own for purposes of this appellate review. The parties are

instructed to attach the opinion of the trial court in any filings referencing this

Court's decision.

Judgment affirmed.


Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: 12/02/2025

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

CHARLES LEFEVER,
    Plaintiff

                          No. CI-20-02229
    v.

HORSEPOWER ENTERPRISES, INC.
    Defendant

## Opinion Sur Appeal

Plaintiff Charles Lefever appeals from the court's decision dated November 18, 2024, following a bench trial. For the reasons that follow, the trial court's decision finding in favor of the Defendant should be affirmed.

## Procedural History

On February 26, 2020, Plaintiff, Charles Lefever, ("Lefever") filed a nine-count complaint against Defendant Horsepower Enterprises, Inc. ("Horsepower"). For each count, irrespective to the correct measure of damages, Lefever demanded $537,204.84 which was the sum he paid to build a custom hotrod from a 1934 Ford Cabriolet body he bought on ebay.[1] A bench trial was held beginning on August 28, 2024 and concluding on August 30, 2024.[2] Lefever testified by video deposition.

At the conclusion of trial, the parties were directed to file proposed findings of fact and conclusions of law, which the parties did on November 4, 2024. Lefever's final conclusion was that he was entitled to $537,204.84 pursuant to each one of his claims.

---

[1] Throughout the trial, the 1934 Ford Cabriolet was referred to in various terms including hot rod, street rod, custom car or car. All terms reference the car that is the subject of this appeal.

[2] The case was re-assigned to the undersigned judge on December 8, 2023.

1

On November 18, 2024, the court's verdict was recorded finding against Lefever and for Horsepower on all nine counts. On November 29, 2024, Lefever filed a Motion for Post Trial Relief and supporting brief which was denied by the trial court on November 3, 2024. On December 16, 2024, Lefever timely filed the Notice of Appeal.

By order dated December 20, 2024, the trial court directed Lefever to file a Concise Statement of Matters Complained of on Appeal. Lefever filed two Concise Statements of Matters Complained of on Appeal. One was filed on January 13, 2025, and the other was filed on January 17, 2025. Because it appears that the January 17, 2025, Statement of Matters Complained of separates the two causes of action set forth in paragraph one of the January 13, 2025, Statement, the trial court will utilize the subsequent filing for this opinion. Lefever alleges the following:

1. The trial court abused its discretion and/or made an error of law when it ruled that the Defendant did not commit fraud and did not negligently or intentionally make false statements in connection with their ability to build a winning, road worthy street rod.

2. The trial court abused its discretion and/or made an error of law when it did not find Defendant liable under the Unfair Trade Practices and Consumer Fraud Law when the evidence established that Defendant created a likelihood of confusion or of misunderstanding when it promised Plaintiff that they would build a "winner" and a roadworthy street rod.

3. The trial court abused its discretion and/or made an error of law when it ruled that Defendant was not in breach of contract when it supplied Plaintiff with a car that is not a winner and is not safe to drive on public roadways.

4. The trial court abused its discretion and/or made an error of law when it ruled that Defendant was not liable for conversion when it charged Plaintiff $537,204.84 for a car not safe to drive on public roadways and is not a winning street rod.

5. The trial court abused its discretion and/or made an error of law when it found that Defendant was not in breach of Pennsylvania implied warranties of fitness for a particular purpose and merchantability when

2

Defendant supplied a car to Plaintiff which is not roadworthy and is dangerous to drive.

6. The trial court abused its discretion and/or made an error of law when it substituted its own opinion for that of the expert witnesses on issues such as the meaning of "winner" regarding car shows, the roadworthiness of the car and the desirability of the street rod built by Defendant.

7. The trial court abused its discretion and/or made an error of law when it found that Plaintiff "only complained much later" when in fact Plaintiff complained about the deficiencies in the car simultaneously with the car was [sic] being taken to car shows.

8. The trial court abused its discretion and/or made an error of law when it did not find Defendant liable for negligence per se for its violations of the Unfair Trade Practices and Consumer Fraud Law, the Magnuson Moss Warrant Act and the breach of warranty claims.

9. The trial court abused its discretion and/or made an error of law when it found that the Defendant was not negligent when it built and supplied a car that is not roadworthy and is dangerous at any speed.

10. The trial court abused its discretion and/or made an error of law when it found that Defendant was not unjustly enriched when it charged Plaintiff $537,204.84 for a car that is not roadworthy and is dangerous to drive.

## Findings of Fact

1. Lefever resides in Palm City, Florida, with his wife, Frances H. Lefever. (N.T. p. 14).

2. Lefever and his wife grew up in in Lancaster County. (N.T. p. 27; See also Deposition Transcript of Lefever, Plaintiff's Exhibit 58, N.T. p. 7).[3]

3. In 1995, Lefever suffered a stroke the day before his 53rd birthday. (N.T. p. 16).

---

[3] Hereinafter Lefever's video deposition will be referenced as Lefever.

4. Prior to his stroke, Lefever was a businessman and worked in sales. (N.T. p. 20, Lefever N.T. p. 11). Lefever also designed, built and ran retirement homes in Lancaster County, which he sold after 37 years. (Lefever N.T. pp. 12-14).

5. After the stroke, Lefever had to give up driving due to issues with his vision. (N.T. pp. 19-20; Lefever N.T. p. 7, 15).

6. Following his stroke, Lefever purchased a computer and could work it quite well. (N.T. p. 21).

7. At some point after his stroke, Lefever began to look on the computer for cars he could buy to restore and he particularly wanted a 1937 Ford Cabriolet convertible. (N.T. p. 24; Lefever N.T. pp. 25-26).

8. Lefever had given up the hotrod car he had been building when he and his wife got married in 1959. (N.T. pp. 15-16, 22; Lefever N.T. p. 16).

9. What led Lefever to Horsepower was driving by there and seeing cars in its showroom. Lefever also knew Greg Sangry, the General Sales Manager at Horsepower ("Sangry") because he lent Sangry his Cadillac to use for the prom. (Lefever N.T. pp. 16, 111).

10. On July 13, 2012, Lefever sent an email to Sangry to say he was looking for a classic hot rod, Ford, 1937 build, and he was putting a list together for what he wanted in a car. (Lefever N.T. pp. 17-19, Plaintiff's Exhibit 1).

11. On April 26, 2013, Lefever emailed Sangry a list of things he wanted for a car. (Lefever N.T. pp. 20-24; Lefever Plaintiff's Exhibits 4 and 4A).

12. Lefever wanted to buy a 1937 Ford and he found a 1937 Ford Cabriolet on e-bay in April of 2013. (Lefever N.T. pp. 25-26, 112-13, 115; N.T. p. 24).

4

13. After purchasing the 1937 Ford Cabriolet on e-bay, Lefever told his wife about his purchase and his wife told him to "go ahead and get it fixed and get it the way you wanted (sic) it." (N.T. pp. 24:23-24; 26).

14. After arranging for the car's delivery to Horsepower, Lefever and his wife went to Horsepower in April, 2013, to meet with Sangry and Gerek Brodfuehrer ("Brodfuehrer") to discuss restoring the car. Broadfuehrer was the original project manager for the car. (N.T. pp. 26-27,190; Lefever N.T. pp. 120-121).

15. Lefever conveyed to Horsepower that it was important to him that the car had to be a "winner." Despite Horsepower being more expensive than other places, Lefever was willing to use their shop. (Lefever N.T. p. 26:22-25; 28).

16. Lefever knew that the cost to build a car from scratch was in the $60,000.00 dollar range and when he talked to Sangry, Lefever believed he was told that the cost could be as much as $160,000.00 to $200,000.00, which did not frighten him because of the paint job alone would be costly. (Lefever N.T. p. 27).

17. Lefever gave Horsepower a $20,000.00 dollar check to start the work. (Lefever N.T. p. 122).

18. There was no written contract to restore the car; the work was done on a time and materials basis, with invoices sent to Lefever initially on a monthly basis and then later on a bi-weekly basis. (N.T. pp. 219-220; Lefever N.T. pp. 116-18; 122).

19. Horsepower would send pictures and a video link with the invoices to show the progress on the work being done to the car. (Lefever N.T. p. 38).

20. Lefever communicated frequently with Horsepower by email. (N.T. pp. 62; 202-03).

5

21. The bills sent by Horsepower described the work that was done with the date, the time spent and described the parts and materials used. (N.T. pp. 74-75; Horsepower Exhibit D-21).

22. Lefever's wife would review the invoices sent from Horsepower and write the checks to pay the bills. She complained to her husband about items she thought were duplicated as reflected in an email from Lefever to Horsepower dated February 14, 2017. (N.T. pp. 72-73, 220; Lefever N.T. p. 37; Lefever Defendant's Exhibit 26).

23. Lefever was not upset about the costs but was upset with the amount of time it was taking to complete the car. (Lefever N.T. p. 125 and Lefever Defendant's Exhibit 26).

24. Lefever's wife was annoyed by the car restoration project. (N.T. pp. 60-61).

25. In addition to picking the type of car to build, Lefever made the final choices regarding the customization of the car including the suspension, transmission, the chrome, the paint color of orange, the interior work, the wheels, hood rods, air ride suspension, and pinstriping. (Lefever, N.T. pp. 67-68; N.T. pp. 201-02; 233, 235-36, 238, 257-59).

26. Lefever testified that he wanted to be able to drive the car from coast-to-coast and that he told Horsepower he wanted to dip the front wheels in the ocean at Atlantic City and then go to California and dip the tires in the ocean again. (Lefever N.T. pp. 32, 67).

27. Brodfuhrer testified that when he was at Horsepower from 2013 to 2017, Lefever came in to see the car twice a year.

6

28. Lefever responded as follows when asked whether Horsepower did not put anything in the car that he did not approve:

**They didn't ask me to approve every single thing they did; they just went ahead and did things. We were trying to obtain a goal of a winner. So I relied on Gerek and Horsepower to do what was right. I didn't bug them about the cost, I didn't kick them, I didn't beat them, I didn't give them a hard time. I tried to do everything they wanted expeditiously so they were happy. You know, that's all I have to say.**

(Lefever N.T. pp. 124-125).

29. Lefever admitted he was happy with what he was seeing in the car. The only thing he was bent out of shape on was the time. (N.T. p. 125).

30. Brodfuhrer testified that he knew Lefever wanted to make the car "a winner" which to him meant that things had to be different from the norm. (N.T. p. 192).

31. Brodfuhrer testified that he knew Lefever was relying on Horsepower to do phenomenal paint, picking a chrome plater whose chrome was proven to be on cars that won awards. Lefever told Brodfuhrer what he wanted and they would discuss it with Brodfuhrer giving options for Lefever to choose. (N.T. p. 199).

32. According to Brodfuhrer, Lefever told him he wanted orange, something wild, something different. (N.T. pp. 201-02).

33. In July of 2017, Brodfuhrer and Sangrey left Horsepower. At that point the car had been at Horsepower for four years and still was not finished. (N.T. pp. 196-97; 210; 307-07).

34. Caroline Ecklin ("Ecklin") became the General Manager at Horsepower in May, 2017, and she sent an email out to customers to let them know Brodfuhrer and Sangry had left the company. (N.T. pp. 305, 308).

7

35. Ecklin's understanding was that Mrs. Lefever would be primarily driving the car and that Lefever would be driving some. (N.T. p. 314).

36. Ecklin was aware that the car had been taking too long to be completed and promised Lefever she would put more team members on his car as they would be available. (N.T. pp. 311-12).

37. Ecklin testified that further delay was caused when the upholsterer, Tom Eberhardt, became ill. (N.T. p. 310).

38. The Lefevers came to Horsepower to see the car when it was nearly completed and they were happy with it. (N.T. p. 332).

39. Lefever made a last-minute change to the car by asking for pinstriping although Ecklin tried to convince him not to do it. Horsepower found someone to do the work; Lefever was shown drawings and Lefever picked what he wanted for the pinstriping. (N.T. pp. 333-34).

40. After a newspaper article came out in September, 2019, regarding the car's restoration, Lefever told Ecklin to make sure the car is prepped and ready. Lefever also told Ecklin that he wanted mirrors placed on the bottom underside to show the chrome. (N.T. p. 316).

41. Ecklin and Lefever discussed what shows Lefever wanted the car to be shown in. (N.T. p. 319).

42. Ecklin recalled Lefever asking if a spring assist could be put on the convertible top if possible. No spring assist was installed. (N.T. p. 313).

8

43. The car was shown in Lexington, Kentucky, then in York County where it got an Honorable Mention, and in Ocean City, Maryland where it got 6th place. (N.T. pp. 147-48, 321, 335).

44. Lefever testified that what made him finally pull the car from Horsepower was when a friend emailed him the newspaper article appearing in the Lancaster Intelligencer on September 8, 2019, in which an employee of Horsepower is quoted as saying "the car is not really meant to be driven because it doesn't handle well going much faster than 40 miles per hour. But that's okay with Lefever." (Lefever N.T. pp. 104-105; Lefever Plaintiff's Exhibit 23).

45. The newspaper article was entitled "Restoring a dream car to former glory." (N.T. p. 54, Plaintiff's Exhibit 31).

46. Lefever testified he was angered by the article and that is what made him decide to pull the car. (Lefever, N.T. pp. 107, 131).

47. At trial, the employee who was quoted in the newspaper article, Daniel King, testified that he did not tell the news reporter that the car would not feel safe driving over 40 mph. The employee explained that the car is an "art piece" and going over 35 would seem criminal if he had gotten a rock chip and the whole panels would have to be repainted. (N.T. p. 151).

48. On October 14, 2019, which was after the newspaper article was published, Lefever sent an email to Horsepower saying he was going to have an appraisal done on the car to insure it and saying he wanted to plan for shows in the spring or for the start of 2020. (Lefever Defendant's Exhibit 24).

9

49. On October 25, 2019, Lefever sent an email to Horsepower saying he just got the appraisal and inspection report and the car scored a number #1 in all categories. The appraisal came in at $295,810.00. Lefever quoted the report including the following:

**The car was totally inspected and scored in the following classes.**

**#1 Excellant: (sic)**

**Restored to maximum professional standards of quality. Perfect original with components operating or appearing as new. No wear, not driven.**

**The car scored a Number: 1 in all categories. Which makes it rated an Excellant (sic) build :)**

....

**The attention to meticulous detail and flawless construction is an award-winning combination.**

(N.T. pp. 339-341; Defendant's Exhibit 17 and Lefever Defendant's Exhibit 25).

50. Lefever testified that he only sent the October 14, 2019, email congratulating Horsepower on the 6th place win because "You don't whip a dog when it's bad." He testified that he sent the email about planning shows in the spring because "You always put bait out for a losing animal." (Lefever N.T. p. 129).

51. When testifying why he did not take the car back from Horsepower because he was dissatisfied, he explained that he did not want to take the car back from Horsepower because he did not want the car to become an "orphan." (Lefever N.T. pp. 101, 128).

52. Lefever has not had any work done to the car since putting it into storage nor has he tried to sell it. (Lefever N.T. pp. 147-48).

53. The total amount of the payments made by Lefever to Horsepower was $537,204.84; the car took 6 years to complete. (N.T. pp. 57, 286).

10

54. Stewart Howden was accepted as Plaintiff's expert on the value and desirability of classic cars. Mr. Howden is the president of the Classic Auto Mall in Morgantown, Pennsylvania, which shows hot rods, muscle cars, classic cars and also does consignment and sales. Lefever's car is housed at the Classic Auto Mall . (N.T. pp. 268-269).

55. Mr. Howden's opinion was the car was not a winning car because of the color, which he opined was popular on hotrods in the seventies and eighties but not currently and because the 1937 Ford Cabriolet is not generally accepted as a hot rod of choice when building a hot rod to win shows. (N.T. pp. 279-282, 288).

56. It was Mr. Howden's opinion that the car at an auction would sell for $100,000.00 to $125,000.00. (N.T. p. 289).

57. Mr. Howden acknowledged that he did not know anything regarding the choices made by Lefever and why the choices were made but he would have guided them differently. (N.T. p. 299).

58. Mr. Howden acknowledged there is a great deal of subjectivity as to what wins an award. (N.T. p. 302).

59. Mr. Howden agreed that people spend more on a car build job than the car is ultimately valued for. (N.T. p. 303).

60. Mr. Howden acknowledged that the people who told him they did not like the car's color were his friends rather than the public coming into the museum to see the cars. (N.T. p. 297).

11

61. Lefever acknowledged that it was common knowledge and he was aware that he was going to spend more to restore the car than he would be able to sell it for. (Lefever N.T. p. 146).

62. Dale Cherry was qualified as an expert witness for Lefever regarding custom car finishing and "drivability" with a particular expertise in electronic fuel delivery. (N.T. p. 94).

63. Mr. Cherry went to the Classic Car Mall in Morgantown to inspect the car in 2024. (N.T. p. 95).

64. Mr. Cherry's first impressions were a nicely looking painted '37 but some of the fit wasn't fantastic. He also noticed the air ride system because of the way the car was sitting. (N.T. p. 95).

65. Mr. Cherry's opinion was that wheels looked like catalog kind of wheels and the chrome was not of a show quality. (N.T. p. 96).

66. Mr. Cherry did not like the way the convertible top fit on the car. (N.T. p. 97).

67. Mr. Cherry also found fault with the frame hardware, the location of the master cylinder and one of the brake lines hitting the back by the rear axle. He opined that the suspension was not robust and was of a lower quality. He did not like the way that the steering wheel connected and explained it would cause a lot of feedback through the wheel, more like a race car than a street rod. Additionally, he did not like the engine cover and thought that no attention was paid to any detail to the engine other than to just cover it up. (N.T. p. 101).

12

68. When Mr. Cherry took the car for a road test, he was not impressed with the way the seat position was and the lack of leg room due to the big speakers. He thought the steering wheel position was a little high and it did not seem like it matched the car.

69. While driving at low speeds, Mr. Cherry testified that every road bump was felt and once the car got over 40 miles an hour, the car wanted to dart left and right. The doors and everything rattled and the power windows did not work. Overall, he opined that it was a "rattle trap kind of deal" and he did not feel safe driving the car. (N.T. pp. 106-07, 111).

70. Mr. Cherry testified that it took too long to fill the gas tank so he opined it needed to be engineered differently. The gauges were not working. (N.T. p. 108).

71. Mr. Cherry testified that taking the top down was very difficult. (N.T. p. 109).

72. Mr. Cherry did not like the look of the gauges opining that they did not fit the styling of the car. (N.T. p. 110).

73. Mr. Cherry's opinion was that the level of detail that was done versus the dollars did not seem to match up, especially for the time period. (N.T. p. 115).

74. Mr. Cherry said winning is only when you get first place. (N.T. p. 116).

75. Mr. Cherry's opinion was that he did not know what items Lefever wanted but that Lefever should not have been permitted to install the large gauges just because he wanted them and he would have turned Mr. Lefever away as a customer if Mr. Lefever had insisted upon the large gauges. (N.T. pp. 128, 134).

76. Mr. Cherry acknowledged that his testimony about design is his personal preference. (N.T. p. 130).

13

77. Cherry does not build hot rods and acknowledged that he was comparing aspects of the car to more modern cars. (N.T. pp. 90, 128, 136).

78. Mr. Cherry was not asked to diagnose what repairs were needed for the car or to perform any type of diagnostic testing. (N.T. pp. 124, 126).

79. There was no evidence given regarding the cost to repair issues with the car as identified by Mr. Cherry and Mr. Cherry acknowledged that some items might only require a minor adjustment. (N.T. p. 125).

80. At time of trial, it was admitted that the Lefevers intended to donate the Ford to a Christian ministry charity or a similar charity and that all Horsepower invoices were paid and no payment was ever withheld. (N.T. p. 354).

## Discussion

The standard of review in non-jury trials is to assess whether the findings of facts by the trial court are supported by the record and whether the trial court erred in applying the law. Upon appellate review, the appellate court must consider the evidence in the light most favorable to the verdict winner and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law. *Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare*, 299 A.3d 937, 956 (Pa. Super. 2023). "We further recognize the importance of deferring to the trial court's factual findings, if supported by the record, because the factual findings "are largely dependent upon the credibility of witnesses [and] because the demeanor and credibility of witnesses, as well as conflicts in the evidence presented, are issues solely determined by the trier of fact and, therefore, beyond the scope of review of appellate courts." *Wilson v. Parker*, 227 A.3d 343, 352 (Pa. Super. 2020) (citation omitted).

14

At the outset, the testimony of Lefever was not credible and appeared to the court to be a case of "buyer's remorse." Lefever was actively involved in the rebuilding and customizing of the 1937 Ford Cabriolet and he was happy with the car until it did not win a first place award after showing in only three shows. Horsepower built the car Lefever wanted.

According to Lefever's expert witnesses, the things that hurt the car's show winning ability were the choice of color, pinstriping, large gauges and the type of car body chosen. The expert witnesses did not realize that these were the things Lefever chose and wanted for his car.

The court also found the testimony that the car would not have been purchased if it had been known that an electric convertible top could not be put on the car not credible because this item never appeared in the emails Lefever sent to Horsepower. Also not credible was that Lefever expected the car to be able to be driven coast-to-coast. Despite Mr. Lefever claiming that Horsepower was just waiting for him to die, the court found no evidence that Lefever was being "tricked" or "deceived" and instead, the record shows that he was pleased with the rebuilding and customization of the car.

The trial court does agree with Lefever that Horsepower took an excessively long time to complete the car but there was no agreed-upon date for completion. Because Lefever was a successful and savvy businessman, Lefever was aware or should have been aware of the importance of putting things into writing. The court did not find that his strokes impaired him cognitively. There was no reason given by either Lefever or his wife that they did not realize how much money was being spent on the car or any

reason why they were unable to remove the car from Horsepower and take it to another shop. The court will now address each statement of error raised on appeal.

1. Fraud.

Lefever's fundamental contention running through all of his claims is that Horsepower promised him a "winner."[4] Lefever also contends that he told Horsepower "that if they could not build a winner, to tell him and he would take it to another builder." (See Plaintiff's Proposed Findings of Fact, ¶ 3). Thus, the trial court viewed this claim as one of fraud in the inducement.

"The elements of fraud in the inducement are as follows: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. 2005) (internal citation omitted). "To establish claim for common law fraud, the elements must be proven by clear and convincing evidence." *Boehm v. Riversource Life Ins. Co.*, 117 A.3d 308, 322 (Pa. Super. 2015).

According to Lefever, the "representation" made to him by Horsepower was that Horsepower would build him "a winner." Lefever further contends that the statement was made to induce him into having his car built by Horsepower. The testimony shows,

---

[4] Lefever also contends that Horsepower never told him they "had no experience building cars such as what Lefever requested, a winning street rod." (See Plaintiff's Proposed Findings of Fact, ¶ 2). Horsepower's primary background is classic car restorations. Lefever provided no evidence to explain how this type of experience makes Horsepower not competent to restore and customize the '37 Ford Cabriolet as both require skill at fabrication, metal work, mechanical work and auto painting.

16

however, that Lefever, not Horsepower, made the statement about wanting the car to be a winner.[5] It was Lefever who made the initial contact as shown by his emails to Sangrey and as shown by his purchasing the 1937 Ford Cabriolet on Ebay without the advice or knowledge of Horsepower or even his own wife. There is nothing in the record showing that it was Horsepower who made the "representation" to Lefever.

Instead, Lefever's theory of fraud depends upon whether Horsepower knew it could not fulfill Lefever's stated desire of having his car be "a winner" when it accepted the car to begin the work of rebuilding it and restoring it. "Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of fact or by silence when good faith required expression." *In re Thorne's Estate*, 344 Pa. 503, 25 A.2d 811, 816 (1942).

Lefever failed to present clear and convincing evidence that Horsepower knew that it could not build a winning hotrod. The court found the testimony of Mr. Brodfuehrer credible. Mr. Brodfuehrer's testimony demonstrated that Horsepower believed the car could be a winner.

Q. Do you remember when he started talking also about it being a winning, car, how long after that?

A. Oh, probably early on, I just don't remember exact – if it was the first day, first month, first year but –

Q. And when he told you he wanted the car to be a winner, what was your reaction to that?

---

[5] Another former employee of Horsepower, Jeff Chompert, who did the car restoration work but left Horsepower prior to the car being finished also testified that he knew Lefever wanted a winning hot rod car. (See testimony of Jeff Chompert, N.T. pp. 156-157, 159, 182)

17

A. Sure, yes.

Q. Did you explain to him what that would entail?

A. No, I mean that's implied, we go to a show and you win.

Q. Did you talk to him about how much work would go into the car to make it a winner?

A. Yeah, I mean to make it a winner, things have to be different from the norm, so over and beyond.

Q. What do you mean by that?

A. Over and beyond from let's say a kit car that you could buy already done or over and beyond the normal, to set it apart.

Q. So when we were just – and you were here when we were speaking about spot welds on that grill. Is that something that you would expect to be smoothed over as you're going beyond with a car so that you don't see something like that?

A. That's a good question, I mean, that's subjective.

Q. Pardon me?

A. That's a good question but I would say it's subject as to one person's quality, whether a judge will say I don't like the spot weld versus this is a factory thing. Librandi's is an accredited chrome plater and I can go to shows where some people might love it and some people – I mean, you can find a flaw in anything.

(N.T. pp. 191:18-192).

Mr. Brodfuehrer's testimony exemplifies the major flaw in Lefever's case, which is the subjectivity involved as to what constitutes "a winner." While Horsepower may have had an understanding as to what would impress a show judge, Horsepower would not

18

have any control over what the show judges ultimately decided when it placed the cars being shown. More importantly, however, Lefever decided to stop showing the car after only three shows, even though it was competitive based on the car winning an honorable mention and a sixth place.

To have a chance at winning, one must actively engage in the competition or pursuit. Lefever chose not to engage in competition yet blamed Horsepower for not achieving a winner.

Lefever also claims in the alternative that the statement made by Horsepower was negligently made.

> The four elements of a common law claim for negligent misrepresentation are: (1) a misrepresentation of a material fact; (2) made under circumstances in which the actor should have known of its falsity; (3) with an intent to induce another to act on it; (4) thereby causing injury to a party who justifiably relied upon the misrepresentation. In contrast with intentional misrepresentation, a negligent "misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words.

*Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 561 (1999) (citing *Gibbs v. Ernst*, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994), citing, Restatement (Second) of Torts § 525 (1977)).

As with the analysis for an intentional misrepresentation, the evidence is lacking with regard to Horsepower having knowledge that it could not make a winning hotrod for Lefever, especially as Lefever withdrew the car from competition after only three shows[6].

---

[6] It was the trial court's observation that Mrs. Lefever had much to do with the car being withdrawn from showing. (See Plaintiff's Proposed Findings of Fact ¶ 55; N.T. pp. 51-54).

19

2. Unfair Trade Practices and Consumer Protection Law.

Lefever made a claim under the "catch-all" provision of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") which provides that it is an unfair and deceptive act to engage in any other fraudulent or deceptive conduct "which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

In 2021, our Supreme Court changed the standard for the actor's state of mind regarding deceptive conduct and held that a "strict liability" standard applies to a claim under the "catch-all" provision of the UTPCPL. *Gregg v. Ameriprise Fin., Inc.*, 644 Pa. 567, 245 A.3d 637 (2021). Accordingly, liability under the catch-all provision will be imposed on sellers who engage in conduct that has the potential to deceive and which creates a likelihood of confusion or misunderstanding.

The court found Lefever's testimony on the issue of being deceived by Horsepower not credible and at times overly dramatic. While the court agrees that it took an unreasonably long time for Horsepower to finish the car, Lefever was actively involved in every respect of the car's restoration and customization.

The record shows that Lefever wanted certain things such as the largest gauges for visual effects, a paddle shifter and a loud stereo system and a certain type of windshield. (N.T. pp. 165-67). Mr. Brodfuerer's testimony was that Lefever was "relying on Horsepower to do phenomenal paint, which I knew we were capable of, of picking a chrome plater that was proven to be on cars that won awards, but also, you know, he would tell me I want this, I want this and we would have discussions about those things." (N.T. p. 199:8-13). Mr. Brodfuerer's testimony also shows that Lefever chose the color to paint the car. (N.T. pp. 201-02). The testimony of Ms. Ecklin demonstrated

20

that against the advice of Horsepower, Lefever wanted pinstriping done on the car. (N.T. p. 333). Because of his active involvement in restoring and building the car, as well as his background in business, the court could not find that the evidence supported Lefever's claim that Horsepower's actions created a likelihood of confusion or misunderstanding on Lefever's part.

3. Breach of Contract.

For a contract to be enforceable, "it must represent a meeting of the parties' minds on the essential terms of their agreement." *Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd.*, 285 Pa. Super. 84, 426 A.2d 1152, 1154 (internal citations omitted). "In order for a party to succeed on a breach of contract claim, a contract must exist, there must have been a breach of the contract, and the breach must have resulted in damages". *412 North Front Street Associates, LP v. Spector Gadon & Rosen, P.C.*, 151 A.3d 646, 657 (Pa. Super. 2016).

The parties do not dispute that there was no written contract. The project was done on a time and materials basis. (N.T. pp. 219-20, Lefever N.T. p. 116). There was no evidence that price limit was ever agreed upon nor was there an agreed-upon date for completion. Instead, the dispute centers on whether the contract was breached because the car was not "a winner" and because the car was not able to be driven safely.

A. The car not being a "a winner" does not constitute a breach of contract.

When asked during his deposition what he meant by "a winner," Lefever explained:

**A. A show car winner... One of the reasons that really drew me to their Horsepower business was Gerek spent a lot of time telling me all the**

21

**shows they take cars to and they win the shows, they have winners. They had pictures, they had trophies, and he said to me – he said "So we will even show your car if you want us to. And I said "that's what I want. Somebody that knows how to show a car, knows how to prepare a car for a show."**

Testimony from Horsepower former employees corroborated Lefever's contention that Horsepower knew he wanted "a winner." Exactly what that meant, however, or how that was to be measured, calculated or determined, was not clarified by the parties. Despite this omission in their agreement, Lefever argues that "even if there is no clear declaration, a contract may be implied in fact." (See Plaintiff's Proposed Findings of Fact and Conclusions of Law, p. 25). Based upon Lefever's testimony and the testimony of his experts, "a winner," by necessary implication, would require that the car place first at a show.

In *Jacobs v. Kraft Cheese Co.,* 310 Pa. 75, 164 A. 774 (1933), our Supreme Court examined a contract to determine whether a certain clause was within the contemplation of the parties by necessary implication at the time they made their contract. The plaintiff had been hired by Kraft after he claimed to have developed a novel and secret process for the manufacture of an improved grade of cream cheese. The employment contract at issue contained a clause that conditioned Kraft's obligations upon the employee "producing a cream cheese satisfactory to the market and trade as demonstrated by increased sales by Kraft of the cream cheese." The plaintiff only worked for about seven weeks and after the cheese was shipped to Kraft's Chicago plant, he was dismissed from his employment. The plaintiff sued Kraft for wrongful discharge.

22

The plaintiff testified that Kraft managers told him his cheese was of good quality and that the company's officers and agents told him the sales would increase. Kraft's evidence was that the cheese was of poor quality and was unfit for sale. In submitting the case to the jury, the trial court said for plaintiff to recover, he had to produce a cream cheese satisfactory to Kraft which meant a cheese that is satisfactory to the market as demonstrated by increased sales. The promise implied was that each party had to give the specified test a chance to function and Kraft had an implied obligation to use reasonable diligence to increase its sales. On review, the Court found that the judge correctly defined and submitted the issue.

> No form of words is necessary to create a promise or covenant; all that is essential is that on a fair interpretation it shall appear that the alleged promisor has agreed to do the act in question. Not only may promises exist then, where the language is in terms that of promise, but also where the agreement shows that the parties must have intended an obligation though they failed so to state in clear terms. These promises, implied in fact, as they may be called, are numerous. * * * Clearer cases of promises implied in fact are the promises implied in every bilateral contract not only not to prevent performance by the other party of the performance by which he will become entitled to receive counter performance, but also to co-operate in such performance if co-operation is necessary from the nature of the case....

*Id.*, 310 Pa. at 80-81; 164 A. at 776 (citing 2 Willison on Contracts, § 670). The Court explained if one undertakes to accomplish a certain result, he agrees by implication to supply all the means necessary thereto, not only does a contract impose the obligations expressed, but also everything which by law, equity and custom, is considered incidental to the contract or necessary to carry it into effect. *Id.* Thus, the court concluded that the only way to test the cream cheese was to put the cheese on the market and attempt to sell it. Because Kraft did not do this, Kraft could not then declare that the cream cheese was not satisfactory to the market.

Here, and aside from the parties not providing any objective means to determine whether the car was "a winner," Lefever stopped showing the car after only three shows. The evidence showed that there is a lot of subjectivity in car shows and that these cars can be cantankerous. There was an implied obligation on Lefever's part to give Horsepower a reasonable period of time to make the necessary adjustments for the car to win at a show. Removing the car from competition altogether and placing it in an auto mall after only three shows constitutes a waiver or discharge of the condition Lefever imposed on Horsepower that the car had to be "a winner."[7]

Lefever's own conduct also contributed to the car not being "a winner" as evidenced by the testimony of his two experts who criticized the color, the pinstriping and the gauges. As much as Lefever wanted to blame Horsepower for his choices, the court did not find his testimony credible in that regard and found that Lefever was actively involved in the build of the car.

B. Plaintiff Failed to Meet His Burden Regarding Damages.

The trial court did not find the testimony credible regarding the Lefevers telling Horsepower that they expected the car could be driven coast-to-coast. Instead, the litigation appeared to be driven more by Lefever not obtaining a first place win within the first three shows and Mrs. Lefever's dissatisfaction over the money her husband spent on the car. The trial court did find credible the testimony regarding the drivability of the car and its air ride system; however, Plaintiff failed to meet its burden of proof by not providing evidence regarding damages.

---

[7] Additionally, Lefever had definite ideas how he wanted the car to be customized which he fails to recognize had an effect on how well the car would do at shows, which included the choice of color and the pinstriping.

24

The general rule with respect to defective performance, although generally expressed with regard to building construction contracts, is the difference between the market value of the item as constructed and the market value that the item would have had if constructed as promised, with the qualification that if it is reasonably practical to cure the defects in construction by repairs, and if the cost of repairs does not exceed the difference in market value, then the measure of damages is the cost of repairs. *See Gadbois v. Leb-Co. Builders, Inc.*, 312 Pa. Super. 144, 458 A.2d 555 (Pa. Super. 1983).

At trial, it was the opinion of Plaintiff's expert witness that the value of the car was between $100,000.00 and $125,000.00. There was no evidence showing what the market value of the car would have been if built as promised although Plaintiff contends the market value of what the car would be worth as promised would be what was actually paid. This contention fails because the testimony at trial and Plaintiff's own testimony showed that what is paid to rebuild and customize an old car is always going to be more than what the car would be worth. Hence, without evidence to establish the market value for the car as promised, Plaintiff cannot meet his burden of proof.

Additionally, there was no evidence to show what the cost of repairs would have been, and whether the cost of the repairs would have exceeded the difference in the market value as promised and the market value as constructed. Without this evidence, the trial court could not award damages.[8]

---

[8] The court found no evidence that Horsepower breached a contract to show the car entitling Lefever to a refund.

## 4. Conversion.

"Conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification. Conversion can result only from an act intended to affect chattel. Specific intent is not required, however, but rather an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights establishes the tort. Money may be the subject of conversion." *Shonberger v. Oswell*, 365 Pa.Super. 481, 530 A.2d 112, 115 (Pa. Super. 1987) (citing Prosser & Keeton, Torts, § 15 (5th ed. 1984)).

In Plaintiff's Proposed Conclusions of Law, Plaintiff, relying on *Shonberger,* contends that the conversion in this case is Horsepower taking the payments of $537,204.84 without providing the bargained for vehicle. (See Plaintiff's Proposed Findings of Fact and Conclusions of Law, p. 22, ¶ 18).

Plaintiff's complaint alleges that Horsepower took possession of $537,204.84 with the intent to exercise control over it and deprived Plaintiff of his right to possess the funds because Defendant did not provide a 1937 Ford that is for the purpose for which it is built. (See Plaintiff's Complaint ¶¶ 49, 50). This is not a conversion.

There are no facts to show an exercise of dominion or control inconsistent with Plaintiff's rights. Plaintiff paid for the car on a time and materials basis over a six-year period of time and was provided with the car built and customized as he dictated.

Plaintiff's conversion claim, if one existed, would also be barred by the gist of the action doctrine because any duties allegedly breached by Horsepower were grounded in the contract to rebuild and customize the car. *See Pittsburgh Construction Co. v.*

26

*Griffith*, 834 A.2d 572 (Pa. Super. 2003) (holding that the plaintiff could not interject a claim for tortious conversion into an action that is decidedly contractual).

5. <u>Implied warranties of fitness for a particular purpose and merchantability</u>.

Other than making broad legal conclusions, Plaintiff did not develop these theories at trial. The complaint includes numerous claims for breach of warranty without identifying the requisite elements of each and how they are to be applied to the alleged facts. Merely making an assertion or legal conclusion is insufficient.[9]

"For the Sales Article of the Uniform Commercial Code to apply there must be a transaction in goods." *Stephenson v. Greenberg*, 421 Pa. Super. 1, 9, 617 A.2d 364, 368 (1992) (internal citation omitted).

A "good" which is defined by the UCC as follows:

> "Goods" means all things (including specially manufactured goods) **which are movable at the time of identification to the contract for sale** other than the money in which the price is to be paid, investment securities (Division 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in section 2107 (relating to goods to be severed from realty; recording).

13 Pa. C.S. § 2105(a) (emphasis added).

Further, "when the transaction involves predominantly the rendition of services, the fact that tangible, movable goods may be involved in the performance of the contract does not bring the contract under the code." *Id.* In its opinion in *Stephenson*, the court gave as an example the case of *DeMatteo v. White*, 233 Pa.Super. 339, 336

---

[9] For instance, Lefever claims that the Magnuson Moss Warranty Act was violated when the evidence shows that there was no written warranty given. "The Act does not require that a seller give a warranty on a consumer product, only that if a warranty is given, it must comply with the terms of the act." *Huegel v. Mifflin Const. Co., Inc.*, 796 A.2d 350, 358 (Pa. Super. 2002). "The Act prescribes content and minimum standards for written warranties, but it is content to supplement state-law implied warranties only by prohibiting their disclaimer in certain circumstances." *Id.* (citation omitted).

A.2d 355 (1975) where a plaintiff sued the contractor who built his house, asserting that the bricks he used were defective. The Superior Court vacated the trial court's order granting judgment on the pleadings, reasoning that the action did not fall under the UCC because the operation was one of building, or construction, not one of sale, within the meaning of the Sales Act.

Because this car was specifically built and customized for Lever over a period of time, Horsepower provided a service, not a good. The car was assembled from various parts including the frame itself which was purchased by Lefever. Other parts for the car were purchased from other outside vendors. Customization of the car, such as the chrome plating, custom interior work, painting, and the like are a mix of a service and materials.

Assuming for sake of argument that the car is a "good," the next question is what its intended purpose was to be. The theme throughout the trial was that the car was to be both "a winner" and that the car should be able to be driven "coast-to-coast" once it was done showing. Because Lefever deprived Horsepower of the ability to fulfill its part of the agreement due to Lefever pulling the car from showing, Lefever cannot maintain a claim that the car was not built to perform for the specific purpose of being "a winner."

As to its ability to drive "coast-to-coast," this is not a car purchased from a car lot. It is a customized car built on a 1937 car frame and built from the ground up. Lefever knew that the car was never intended to be driven as a modern-day passenger vehicle and his testimony and his wife's testimony to the contrary is not credible. While Lefever presented some evidence regarding the car's poor handling and the air ride system,

28

with the test drive being done four or five years after the car had been sitting in storage, the expert witness did not assess the car for repairs.

6. and 7. Expert Testimony/Credibility of Witnesses.

Plaintiff contends that the court abused its discretion by substituting its own opinion for that of the expert witnesses on issues such as the meaning of "winner" and "roadworthiness of the car" and the desirability of the street rod built by Defendant. Plaintiff also contends that the court did not make certain findings of fact.

"Questions of the weight of the evidence are solely the province of the fact-finder – here, the trial court – who is free to believe or to disbelieve any evidence it chooses." *Thorson v. EEDW, LLC*, 309 A.3d 141, 147 (Pa. Super. 2024). This includes credibility determinations for expert witnesses.

The testimony of Mr. Cherry was undermined by his acknowledgement that he does not build hot rods. His opinion was also based upon his personal preferences. Further, he was not asked to diagnose any repairs to the car and he acknowledged that items might only require a minor adjustment.

The testimony of Mr. Howden was undermined by his not being aware that the things affecting the value of the car were the things chosen by Lefever, namely the 1937 Cabriolet frame and the paint color. The court did find his opinion credible that people spend significantly more on a build job than what the car is ultimately valued for.

8. Negligence Per se.

The concept of negligence per se establishes the elements of duty and breach of duty where an individual violates an applicable statute, ordinance, or regulation designed to prevent a public harm. However, a plaintiff, having proven negligence per se cannot recover unless it can be proven that such negligence was the proximate cause of the injury suffered.

29

....

In order to prove a claim based on negligence per se, the following four requirements must be met:

(1) The purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally;

(2) The statute or regulation must clearly apply to the conduct of the defendant;

(3) The defendant must violate the statute or regulation;

(4) The violation of the statute or regulation must be the proximate cause of the plaintiff's injuries.

*Ramalingam v. Keller Williams Realty Group, Inc.*, 121 A.3d 1034, 1042-43 (Pa. Super. 2015) (internal citation omitted).

Plaintiff's complaint and filings allege that numerous statutes have been violated and warranties breached. He fails to adequately develop these theories much less present evidence to meet his burden of proof at trial.[10]

9. Negligence.

"Generally, to prevail in a negligence case, a plaintiff must demonstrate the following elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) a causal relationship between the breach and the resulting injury suffered by the plaintiff; and (4) actual loss suffered by the plaintiff...." *Remalingam,* 121 A.3d at 1043.

As discussed above, however, Plaintiff's claims are grounded in a contract and hence, the negligence claim is barred by the gist of the action doctrine. *See J.J. DeLuca Co. v. Toll Naval Associates, 56 A.3d 402, 413 (Pa. Super. 2012),* (the

---

[10] Had preliminary objections been filed, these claims would not have survived and would therefore be moot.

30

doctrine bars a tort claim, if the contract defines the parties' obligations and the tort duplicates those obligations. Gist of the action applies if the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of tort.). Plaintiff makes no argument that the gist of the action doctrine does not apply.

10. Unjust Enrichment.

Plaintiff's final claim of error is that the court erred by not finding the Defendant was unjustly enriched because the car was not roadworthy and dangerous to drive. A cause of action for "unjust enrichment" is a claim by which the plaintiff seeks restitution for benefits conferred on and retained by a defendant who offered no compensation in circumstances where compensation was reasonably expected. The elements necessary to prove unjust enrichment are:

> (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. (citations omitted). The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

***Artisan Builders, Inc. v. Jang***, 271 A.3d 889, 892 (Pa. Super. 2022) (internal citation omitted).

Lefever's theory is that since he overpaid for the work done to rebuild and customize his car it would be unjust for Horsepower to keep all the money that he paid pursuant to the invoices he received. He contends that he should be refunded the entire $537,204.84 paid for the car. (See Plaintiff's Proposed Findings of Fact and Conclusions of Law, p. 26). Lefever misapplies unjust enrichment to the facts.

31

An example of unjust enrichment is Painter Joe is hired to paint A's house but paints B's house by mistake. B has been enriched by the painting done to his house and should offer compensation to Painter Joe for the value he received. Lefever cites no authority to show how unjust enrichment applies to his factual scenario where he is dissatisfied with the services provided by Horsepower and expects a full refund.

The Court submits this opinion as the trial court opinion required by Pennsylvania Rule of Appellate Procedure 1925(a).

JEFFREY A. CONRAD, JUDGE

Date: Feb 12, 2025
COPIES TO:

Sharon Brass, Esquire
Melvin Newcomer, Esquire

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA. R.C.P. NO. 236
NOTIFICATION - THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
PROTHONOTARY OF LANCASTER CO., PA
DATE: 2-13-25